**Gen. 111]** **111**

## COUNTIES

**COMMISSIONER COUNTY POWERS – WHETHER COMMISSIONER COUNTIES MAY PROVIDE FOR A DIFFERENT DEFINITION OF "NEWSPAPER" THAN PROVIDED IN SECTION 1-113 OF THE GENERAL PROVISIONS ARTICLE – WHETHER A CHANGE IN THE DEFINITION OF "NEWSPAPER" WOULD BE AN "ADMINISTRATIVE ACT" THAT COULD BE TAKEN WITHOUT A PUBLIC HEARING**

November 5, 2021

*The Honorable James Randy Guy*
*President, Board of County Commissioners of St. Mary's County*

On behalf of the Board of County Commissioners of St. Mary's County, you requested our opinion on two questions concerning the County Commissioners' power to define the terms "newspaper" and "newspaper in general circulation." First, you ask whether the County Commissioners may adopt a definition of those terms that is less restrictive than the definition in Md. Code Ann., Gen. Prov. ("GP") § 1-113, which applies, "[u]nless otherwise provided," to any "law, resolution, or court order, judgment, or decree that refers to publishing a legal advertisement or legal notice." Second, assuming the County Commissioners may adopt a different definition of "newspaper" and "newspaper in general circulation," you ask whether that redefinition would be an "administrative act" that the County Commissioners may take without holding a public hearing under Md. Code Ann., Local Gov't ("LG") § 9-105.

As to your first question, we read GP § 1-113 to be exactly what it appears to be—a default definition of two terms that often appear in Maryland's general and local laws. Although the definition in GP § 1-113 applies "[u]nless otherwise provided," we do not read that phrase as delegating power to local governments. Rather, the phrase merely recognizes a general principle applicable to statutory definitions—that a particular law may supplant a general definition with its own, specific definition. Section 1-113's definition therefore applies to a law that uses the term "newspaper" or "newspaper in general circulation" "[u]nless otherwise provided" *in that law itself*, which in turn means that a legislative body can change the default definition only if it has power to amend that other law. We also do not read § 9-107 of the Local Government Article—which grants St. Mary's County the

authority to "provide for advertising, printing, and publishing of . . . laws, ordinances, resolutions, or regulations adopted by the county"—as authorizing the County to amend requirements on advertising in "newspapers" that are imposed by State law, including the criteria in GP § 1-113.

On that understanding, the St. Mary's County Commissioners may not redefine "newspaper" and "newspaper in general circulation" for purposes of laws that the General Assembly has enacted, including both public general and public local laws, because commissioner counties lack the authority to amend the General Assembly's enactments. The County Commissioners *may* generally redefine those terms for purposes of local ordinances that the commissioners themselves have enacted. Even then, however, if the local ordinance is based on a State enabling statute that mandates notice in a "newspaper" or "newspaper in general circulation," the ordinance must conform to the enabling statute, and thus must follow the definition in GP § 1-113 unless the particular enabling statute provides otherwise. In other words, if the St. Mary's County Commissioners wish to change the definition of "newspaper" or "newspaper in general circulation" in a statute enacted by the General Assembly, they must seek action from the General Assembly.

As to your second question, we conclude that a legislative act, such as amending an ordinance, cannot be an "administrative act" within the meaning of LG § 9-105. Because the definition of "newspaper" in GP § 1-113 is incorporated into ordinances unless the ordinance "otherwise provide[s]," a change to the definition of "newspaper" in a local ordinance would constitute an amendment to that ordinance and would therefore be a legislative act subject to the public-hearing requirement.

# I
## Background

### A. *Commissioner Counties*

Maryland has three forms of county government: "charter home rule" counties are governed by Article XI-A of the Constitution, "code home rule" counties are governed by Article XI-F, and counties that have not chosen to adopt either form of home rule are "commissioner counties," governed by Article VII. St. Mary's County is among the counties that have chosen to retain the traditional "commissioner county" form of government. As the name indicates, a commissioner county is governed by an elected

Board of County Commissioners, which has both legislative and executive authority. *E.g.*, *County Comm'rs for Carroll County v. Forty West Builders, Inc.*, 178 Md. App. 328, 338-39 (2008).

In non–home rule counties, the powers and duties of the county commissioners "shall be such as now are or may be hereafter prescribed by law," i.e., by the General Assembly. Md. Const., Art. VII, § 2. The county commissioners may exercise only those powers that the General Assembly has expressly granted by statute, along with any implied powers that are necessary to carry out their express powers. *E.g.*, 89 *Opinions of the Attorney General* 48, 49 (2004). Statutory grants of power to commissioner counties are strictly construed. *E.g.*, 89 *Opinions of the Attorney General* at 50.

The General Assembly has delegated a range of powers to the St. Mary's County Commissioners. These include the power to impose and collect a property tax, LG § 16-109; the power to define violations punishable as misdemeanors or civil infractions, *id.* § 12-804; the power to adopt a zoning code, Md. Code Ann., Land Use ("LU") §§ 4-102, 4-103; and authority over roads in the county, LG § 12-503; St. Mary's County Code, ch. 109. As is especially relevant here, the County Commissioners also have the power to "provide for advertising, printing, and publishing of . . . laws, ordinances, resolutions, or regulations adopted by the county." LG § 9-107(c).

But because St. Mary's County is a commissioner county, the General Assembly retains plenary authority and may regulate the county "in virtually any manner it sees fit." 76 *Opinions of the Attorney General* 137, 137 (1991) (quoting 62 *Opinions of the Attorney General* 275, 279 (1977)). In addition to enacting "public general laws" applicable to the entire State or to multiple commissioner counties, the General Assembly may enact "public local laws" applicable to a single commissioner county. *See, e.g.*, *Cole v. Secretary of State*, 249 Md. 425, 428-29 (1968); *see also* GP § 1-206 (noting that a public local law enacted by the General Assembly takes precedence over a public general law in the event of a conflict). Public local laws are usually codified in the county code rather than the Maryland Code. *See* St. Mary's County Code, Div. 1. The County Commissioners, in turn, may enact ordinances to carry out properly delegated powers and to "implement and facilitate and insure the proper execution" of public general laws and public local laws enacted by the General Assembly. *See Scull v. Montgomery Citizens League*, 249 Md. 271, 281-82 (1968). But

a public general or public local law enacted by the General Assembly prevails over a local ordinance in the event of a conflict, because "County Commissioners may only perform acts expressly or impliedly permitted or conferred on them by the General Assembly." 43 *Opinions of the Attorney General* 138, 138 (1958).

### B. *Notice by Newspaper Publication*

When delegating powers to counties, the General Assembly often prescribes procedures for the exercise of those powers. One common requirement is that before exercising a particular power, a county must publish notice of its proposed action in a "newspaper" or "newspaper in general circulation." For instance, the St. Mary's County Commissioners must annually hold public hearings on the proposed county budget and must publish notice of those hearings in one or more "newspapers of general circulation." St. Mary's County Code § 27-5. The County Commissioners must also publish newspaper notice before enacting ordinances in the exercise of certain delegated powers. LG § 9-105(c)(2). Some ordinances adopted by the County Commissioners themselves also contain newspaper notice requirements. For example, the St. Mary's County Zoning Ordinance requires notice in a "newspaper of general circulation" of a public hearing on any proposed amendments to the zoning ordinance. St. Mary's County Zoning Ord. § 21.3.1.

Section 1-113 of the General Provisions Article defines "newspaper" and "newspaper in general circulation" as follows:

> Unless otherwise provided, in a law, resolution, or court order, judgment, or decree that refers to publishing a legal advertisement or legal notice, words such as "newspaper" or "newspaper in general circulation" mean a publication that:
>
> (1) has at least four pages;
>
> (2) habitually contains news items, reports of current events, editorial comments, advertising matter, and other miscellaneous information that is of public interest and is found generally in an ordinary newspaper;
>
> (3) has been published and distributed, by sale, from an established place of business at least once a week for 6

months or more before publication of the
advertisement or notice;

(4) has general circulation throughout the
community where the publication is
published; and

(5) qualifies for Periodicals rates for mailing
through the United States Postal Service.

GP § 1-113(a).[1]

Governments have traditionally used newspapers to give
formal public notice of their activities, especially activities that
could affect private rights. *See* Lauren A. Rieders, *Old Principles,
New Technology, and the Future of Notice in Newspapers*, 38
Hofstra L. Rev. 1009, 1010 (2010). Maryland, in particular, has a
long history of newspaper notice requirements. In 1784, for
example, the General Assembly directed the Baltimore Town
Commissioners to hold a public hearing on a local matter but only
after "giving twenty days['] notice in the Baltimore news-papers."
1784 Md. Laws, ch. 46. The early nineteenth century saw the
General Assembly adopt more general laws providing for
newspaper notice. *See, e.g.*, 1805 Md. Laws, ch. 110 (newspaper
notice of insolvency petitions). The Constitution of 1867, as
originally ratified, contained a variety of newspaper notice
requirements. Md. Const. (1867) Art. II, § 20 (applications for
pardons); Art. VI, § 4 (cash balances in the Treasury); Art. XIV,
§ 1 (constitutional amendments).

Over time, the General Assembly began to impose newspaper
notice requirements on the counties as well, including St. Mary's,
*see*, *e.g.*, 1904 Md. Laws, ch. 401 (real estate tax sales); 1912 Md.
Laws, ch. 209 (sale of surplus road construction equipment), but
the Legislature also tightly controlled counties' spending on
newspaper advertising, *see, e.g.*, 1878 Md. Laws, ch. 290
(authorizing St. Mary's County to spend up to $700 per year on
newspaper publication).

One recurring problem, both in Maryland and elsewhere, was
how to define a "newspaper" or "newspaper in general circulation"
given the many print publications available at the time. *See* Dale
R. Agthe, Annotation, *What Constitutes Newspaper of "General*

---

[1] As discussed further below, a different definition applies in Prince
George's County. GP § 1-113(b).

*Circulation" Within Meaning of State Statutes*, 24 A.L.R.4th 822 (1983). The stakes could be high: in 1919, Baltimore City's new home rule charter was unsuccessfully challenged on the ground that the newspapers where it was published before the election were not newspapers of general circulation. *Williams v. Broening*, 135 Md. 226, 229 (1919).

In 1941, therefore, the General Assembly enacted the predecessor of today's GP § 1-113, entitled "an Act . . . defining the publications in which legal notices and legal advertising shall be inserted." 1941 Md. Laws, ch. 905. The act added a new section to the Code—Article 76, § 8—which provided that "[a]s used in any law, ordinance, resolution, decree, or order of court, the term 'paper,' 'newspaper,' 'newspaper in general circulation,' 'newspaper devoted to the dissemination of general news,' or terms of similar import, shall be defined as a publication having the following requirements," and then listed the five criteria of today's GP § 1-113, which have not changed in substance.

In 1984, as part of the code revision process that created the State Government Article, the definition of "newspaper" was moved to Section 28 of Article 1 ("Rules of Interpretation"). 1984 Md. Laws, ch. 284, § 9. The introductory clause was edited to read:

> In a law, resolution, or court order or decree that refers to publishing a legal advertisement or legal notice, words such as 'paper', 'newspaper', 'newspaper in general circulation', or 'newspaper devoted to the dissemination of general news' mean, unless otherwise provided, a publication that . . . .

*Id.* The same five criteria followed. *Id.* The Revisor's Note indicated that these changes were not intended to substantively alter the statute's meaning. *Id.* (Revisor's Note to Art. 1, § 28). The Revisor's Note also explained that "the phrase 'unless otherwise provided' is added to note generally that, e.g., the law that requires publication may expressly define 'newspaper' to have another meaning." *Id.*

The only substantive change came in 2001, when the General Assembly provided an alternative definition of "newspaper in general circulation" for purposes of public general laws in Prince

George's County.[2] 2001 Md. Laws, ch. 709. While that legislation was pending, our Office advised a member of the House of Delegates that because Prince George's County is a charter home rule county, an act of the General Assembly would be necessary only to change the definition of "newspaper" for purposes of public general law, and not for purposes of public local law or local ordinances. Letter from Robert A. Zarnoch, Counsel to the General Assembly, to Del. Obie Patterson (Mar. 14, 2001) ("Patterson Letter"). The advice letter reasoned that the statutory definition of "newspaper in general circulation" "does not preempt this area of the law" because it "state[s] a rule of construction 'unless otherwise provided,'" and that "implicit in the express powers of the charter counties to legislate is the authority to specify notice rules governing the administration of its own ordinances." *Id.* at 1-2.

Finally, in 2014, as part of the code revision process that created the General Provisions Article, the General Assembly transferred the definition to its current location at GP § 1-113, and adopted its current wording as set forth above. 2014 Md. Laws, ch. 94, § 2. The introductory clause was revised somewhat, including by moving the phrase "unless otherwise provided" to the beginning, but the changes were again intended as non-substantive. *Id.* § 4.

**II**
**Analysis**

You have explained that the St. Mary's County Commissioners wish to adopt a definition of "newspaper" that would omit the requirement in GP § 1-113(a)(3) that a newspaper be distributed "by sale," such that St. Mary's County would be able

---

[2] Specifically, Chapter 709 of 2001 added what is now GP § 1-113(b), which reads: "Subject to subsection (a) of this section and for purposes of the public general laws of the State, in Prince George's County, 'newspaper in general circulation' includes a newspaper that: (1) is designated by the County Council as a newspaper of record; or (2)(i) qualifies under subsection (a) of this section with respect to Prince George's County; and (ii) is published by a small business as defined in § 14-201 of the State Finance and Procurement Article." It is our understanding that, soon after its enactment, subsection (b) was challenged in circuit court as a violation of the dormant Commerce Clause of the United States Constitution. *See News World Communications, Inc. v. James*, Case No. CAL 01-20482 (Prince George's Cir. Ct.). Because subsection (b) is not at issue here, however, we need not address its constitutionality.

to publish notices in a free newspaper. With that background, we turn to your questions: (1) whether St. Mary's County may adopt its own definition of "newspaper" and "newspaper in general circulation" for local purposes, and (2) if so, whether the County Commissioners may do so without holding a public hearing.

Because commissioner counties' powers derive entirely from statute, *see* 89 *Opinions of the Attorney General* at 49, the answer to both of your questions is a matter of statutory interpretation. "The cardinal rule of statutory interpretation is to ascertain and effectuate the real and actual intent of the Legislature." *Lockshin v. Semsker*, 412 Md. 257, 274 (2010). In ascertaining legislative intent, Maryland courts "look first to the language of the statute, giving it its natural and ordinary meaning." *Sabisch v. Moyer*, 466 Md. 327, 350 (2019). However, especially when the language of the statute is not clear, courts will also consider other "external manifestations" of legislative intent, including the statute's context, legislative history, and "other material that fairly bears on the fundamental issue of legislative purpose or goal." *Kaczorowski v. Mayor & City Council of Baltimore*, 309 Md. 505, 515 (1987). Where multiple statutes deal with the same subject, we will attempt to harmonize them to the greatest extent possible. *Government Emps. Ins. Co. v. Insurance Comm'r*, 332 Md. 124, 132 (1993).

## A.    *Local Definition of "Newspaper" and "Newspaper in General Circulation"*

Your first question requires us to consider the relationship between GP § 1-113—the General Assembly's definition of "newspaper" and "newspaper in general circulation"—and the delegated powers of St. Mary's County, a commissioner county without home rule. We begin by considering whether St. Mary's County may redefine "newspaper" and "newspaper in general circulation" for purposes of statutes enacted by the General Assembly, including public general laws and public local laws. We then examine whether the County Commissioners may redefine those terms for purposes of local ordinances.[3] As we will explain, neither GP § 1-113 nor LG § 9-107—which delegates to counties the power to "provide for advertising, printing, and publishing" of certain materials—authorizes St. Mary's County to amend the General Assembly's enactments, including the statutory definition of "newspaper" incorporated into those enactments. The County

---

[3] For the sake of conciseness, in the remainder of this opinion we will primarily refer to the word "newspaper," but the same analysis applies to the phrase "newspaper in general circulation" or any other similar phrases intended to be covered by the definition in GP § 1-113.

Commissioners may, however, adopt a definition of "newspaper" in *local ordinances* that departs from GP § 1-113's default, unless the local ordinance's publication requirement implements a State statute that itself requires publication in a "newspaper."

### 1. Local Authority to Redefine "Newspaper" for Purposes of State Laws

We first consider whether St. Mary's County may redefine the term "newspaper" for purposes of laws enacted by the General Assembly. Section 1-113 of the General Provisions Article states that, "[u]nless otherwise provided," it governs any "*law*, resolution, or court order, judgment, or decree that refers to publishing a legal advertisement or legal notice." GP § 1-113(a) (emphasis added). Both public general laws and public local laws are therefore clearly within GP § 1-113's scope.

So what effect does GP § 1-113 have on those public general and public local laws that use the word "newspaper"? A statutory definition like GP § 1-113 is generally understood as establishing the default meaning of a term. That is, although the statutory definition ordinarily controls the meaning of the term, a specific law—even one within the scope of the definitional statute—may contain its own definition of the same term that is intended to control in that specific context. *See, e.g.*, *McDonald v. State*, 141 Md. App. 371, 378-79 (2001) ("The language of [a] specific section prevails over the definition . . . in [a] general definitions section[.]"); *cf. Bostetter v. Fahrney-Keedy Mem'l Home for the Aged, Inc.*, 20 Md. App. 234, 241-42 (1974) (standing for the similar principle that the default statutory definition of a term might not apply to a specific statute when the context of that specific statute and other indicia of legislative intent suggest that the term was intended to have a different meaning); 105 *Opinions of the Attorney General* 3, 28 (2020).

But the "default" status of the definition in GP § 1-113 does not mean local governments have carte blanche to ignore that definition when the word "newspaper" appears in a State statute. A statutory definition, when it does apply, is more than a mere interpretative suggestion; it is part of the law. So when a law uses a statutorily defined term, and no legislative intent to adopt a different definition can be discerned from that law, *see Bostetter*, 20 Md. App. at 241-42, the statutory definition applies and is effectively incorporated by reference; it controls the scope of the law and binds anyone subject to the law. *See, e.g.*, *Bryant v. State*,

393 Md. 196, 206 (2006); *F.D.R. Srour P'ship v. Montgomery County*, 179 Md. App. 109, 129-30 (2008); *Gambo v. Bank of Md.*, 102 Md. App. 166, 175, 184 (1994); *see also, e.g.*, *National Farmers Union Prop. & Cas. Co. v. Estate of Mosher*, 22 P.3d 531, 533 (Colo. Ct. App. 2000) ("To ignore a definition section is to refuse to give legal effect to a part of the statutory law of the state."); 2A Norman J. Singer & Shambie Singer, *Sutherland Statutory Construction* § 47:7 (7th ed. 2020) (explaining that a legislature in enacting a statutory definition "exercises its legislative power").[4]

A statutory definition such as GP § 1-113's definition of "newspaper" thus governs "[u]nless otherwise provided" *in the law that uses the defined term.* So, for example, in a statute enacted by the General Assembly requiring publication of notice in a "newspaper," such as LG § 9-105(c)(2) (a public general law) or Section 27-5 of the St. Mary's County Code (a public local law), we look only to the General Assembly's enactment to determine whether it has overridden the default definition in GP § 1-113. *See* 1984 Md. Laws, ch. 284, § 9 (Revisor's Note to Art. 1, § 28). And because statutory definitions are part of the law, a legislative body cannot adopt a conflicting definition for purposes of a particular law unless it has power to amend that law, i.e., the law that uses the defined term.[5] This means, as our Office has previously advised, that a home rule county cannot change the definition of a term as it is used in public general law. *See* Patterson Letter, *supra*, at 1. It also means, as relevant here, that a commissioner county cannot change a definition in any law enacted by the General Assembly, including a public local law, because the County Commissioners lack power to amend the General Assembly's enactments. *See* 43 *Opinions of the Attorney General* 138, 138 (1958) ("Such powers as [commissioner counties] have are all delegated and may be changed or added to only by the Legislature.").

---

[4] To be clear, the definition itself is also subject to ordinary principles of statutory interpretation, including consideration in light of context. *See Maguire v. State*, 192 Md. 615, 623-24 (1949).

[5] Administrative agencies are sometimes delegated power to define terms in a statute. *See Maryland Pennysaver Grp., Inc. v. Comptroller*, 323 Md. 697, 708 (1991). Even in such cases, however, the agency's definition cannot contradict the statute. *See, e.g.*, *Fogle v. H & G Restaurant, Inc.*, 337 Md. 441, 453 (1995) ("Agency regulations must be consistent with the letter and the spirit of the law under which the agency acts."). Nor will courts defer to an agency's regulation interpreting a statute if the agency's interpretation conflicts with the unambiguous terms of the statute. *See, e.g.*, *United Parcel Serv., Inc. v. Comptroller*, 69 Md. App. 458, 472-73 (1986).

GP § 1-113's qualifying phrase "[u]nless otherwise provided" aligns with that understanding. That phrase, which was added to the statute during a non-substantive code revision more than forty years after its enactment, is best understood as merely recognizing this general principle of statutory interpretation—that a specific statute may override a general statutory definition—and not as delegating new authority to commissioner counties to amend the General Assembly's enactments. *See Comptroller v. Blanton*, 390 Md. 528, 538-39 (2006) (changes to statutory wording in code revision are presumptively non-substantive); 1984 Md. Laws, ch. 284, § 9 (Revisor's Note to Art. 1, § 28) (explaining that "the phrase 'unless otherwise provided' is added to note generally that, e.g., *the law that requires publication* may expressly define 'newspaper' to have another meaning" (emphasis added)). GP § 1-113 no more authorizes commissioner counties to redefine "newspaper" in statutes enacted by the General Assembly than it authorizes them to delete a statutory "newspaper" publication requirement altogether.

But that conclusion does not end our analysis, even as to State statutes; we must also consider whether LG § 9-107 delegates authority that GP § 1-113 does not. As noted above, that statute grants the St. Mary's County Commissioners authority to "provide for advertising, printing, and publishing of . . . laws, ordinances, resolutions, or regulations adopted by the county." LG § 9-107(c).[6] The question, then, is whether LG § 9-107(c) grants the St. Mary's County Commissioners greater power over newspaper notice requirements than they would otherwise have, including the power to relax notice requirements imposed by the General Assembly.

Because the statute does not further specify what it means to "provide for" advertising and printing, we examine its context and history. The General Assembly enacted the predecessor of LG § 9-107 in 1947, as part of a new code of delegated powers for the commissioner counties. 1947 Md. Laws, ch. 730; *see* Md. Legislative Council, *Report to the General Assembly of 1945*, pt. II, at 37-38; *id.* pt. III, at 148-50.[7] One reason for Chapter 730's

---

[6] As we will explain later in Part II.B of our opinion, although the statute's text refers only to particular categories of publication, the provision is best read as also extending to other categories of publication that are not explicitly enumerated, including newspaper notices.

[7] Numerous counties, including St. Mary's County, were originally excluded from Chapter 730's grant of powers. 1947 Md. Laws, ch. 730, § 1. These exclusions were gradually eliminated, including for St. Mary's County in 1965. 1965 Md. Laws, ch. 228.

enactment was that counties, fearing strict application of the rule that all expenditures by the county commissioners require legislative authorization, would request at each session a large volume of bills authorizing expenditures for particular purposes. Md. Legislative Council, *The Problem of Local Legislation in Maryland* 8 (1940); *see Peter v. Prettyman*, 62 Md. 566, 571, 576-77 (1884) (holding Montgomery County Commissioners could not pay Clerk of the Circuit Court for preparing an index of real property instruments without legislative authorization). Chapter 730 therefore delegated to the counties the authority to provide for matters of recurring expenditure, *see The Problem of Local Legislation*, *supra*, at 8, such as newspaper notices, 1947 Md. Laws, ch. 730 (enacting Art. 25, § 2A(j)).

But nothing in the text, context, or history of what would become LG § 9-107(c) indicates that the General Assembly meant to grant counties authority to alter or relax procedural limitations it had imposed on other powers delegated to the counties, such as a requirement that notice of certain actions be published in a "newspaper" as defined by GP § 1-113. Indeed, we have at least three reasons to doubt such a delegation occurred.

First, a statute enabling commissioner counties to relax or repeal statutorily prescribed procedural limitations on their own powers—such as the requirement that the county give notice of certain actions in a newspaper satisfying all of GP § 1-113's criteria—could raise constitutional concerns. Only the General Assembly can increase the powers of the commissioner counties. *See* Md. Const., Art. VII, § 2; 43 *Opinions of the Attorney General* at 138. And only home rule counties have express constitutional authority to amend public local laws the Legislature has enacted, while no local government has express constitutional authority to amend public general laws. *See* Md. Const., Art. XI-A, § 3; Art. XI-F, § 3. A statute authorizing commissioner counties to delete procedural restrictions in their own enabling legislation would raise questions under both of those principles. When possible, we avoid interpreting statutes in a manner that calls their constitutionality into doubt. *See, e.g.*, *G. Heileman Brewing Co. v. Stroh Brewery Co.*, 308 Md. 746, 763 (1987).

Second, interpreting LG § 9-107 as authorizing commissioner counties to alter procedural requirements the General Assembly has imposed on the counties' own powers would also run afoul of the rule that the delegated powers of commissioner counties should be strictly construed. *See* 89 *Opinions of the Attorney General* at 50; *cf.* 76 *Opinions of the Attorney General* at 140-41 (concluding that the power to impose civil remedies, as a power not normally

delegated to commissioner counties, would not be implied in the absence of an express grant from the Legislature); 43 *Opinions of the Attorney General* at 138-39 (same for power to impose penalties).

Third, Chapter 730, when read as a whole, suggests an overall intent to preserve the fundamentals of the relationship between the State and commissioner counties—allowing such counties to adopt and amend ordinances implementing public general and public local laws while still requiring them to comply in full with the requirements of the enabling laws themselves. *See* Md. Legislative Council, *Local Government: A Comparative Study* 55 (1944) (explaining that the legislative proposal that became Chapter 730 "would introduce nothing unusual or novel into county government" and that the powers it would confer "already are conferred upon many counties in Maryland"). Indeed, no other provision of Chapter 730 appears to delegate power to loosen legal requirements imposed by the Legislature; on the contrary, several of the provisions of Chapter 730 were expressly subjected to existing public local law. Subsection (c), for example, empowered counties "[t]o grant franchises as provided under existing Public General or Public Local Laws," and subsection (d) authorized them "[t]o provide for the appointment and removal of all county officers and employees except those whose appointment or election is provided for by the Constitution or Public General or Public Local Laws." 1947 Md. Laws, ch. 730. For those reasons, we do not read LG § 9-107 as delegating power to local jurisdictions to define "newspaper" differently from GP § 1-113 for purposes of State statutes that follow the default definition.

In sum, then, when a public general or public local law enacted by the General Assembly incorporates GP § 1-113's default definition, the St. Mary's County Commissioners may not alter it. Section 1-113's "[u]nless otherwise provided" language merely recognizes that the State statute itself may define "newspaper" differently, and LG § 9-107 does not delegate to commissioner counties the authority to amend the Legislature's enactments.

### 2. Local Authority to Redefine "Newspaper" for Purposes of Local Ordinances

We next consider whether the County Commissioners may adopt a new definition of "newspaper" for purposes of local ordinances that currently use GP § 1-113's default definition.

Section 1-113's text does not expressly include local ordinances, so the statute is ambiguous as to whether it applies to such ordinances by default. But the statute's history confirms that it includes local ordinances as well as General Assembly enactments. As originally enacted, the statute explicitly covered "ordinance[s]" as well as "law[s]." 1941 Md. Laws, ch. 905. The word "ordinance" was deleted during the code revision process, and there is no evidence that the deletion was meant to change the statute's meaning. *See* 1984 Md. Laws, ch. 284, § 9; *Blanton*, 390 Md. at 538-39. Although the Revisor's Note does not explain the change, the reasoning may have been that the word "law" already encompassed all enactments with the force of law, including valid local ordinances. *See Herman v. Mayor & City Council of Baltimore*, 189 Md. 191, 195 (1947) ("[A]n ordinance passed in pursuance of express legislative authority is a law within the meaning of the Constitution[.]"); *cf. Secretary, Dep't of Pub. Safety & Corr. Servs. v. Demby*, 390 Md. 580, 606-08 (2006) (legislative regulations can be "laws" subject to the *ex post facto* prohibition of Article 17 of the Declaration of Rights).[8] The reference to "law[s]" in GP § 1-113 is thus best read as including local ordinances.

However, because the power to define or redefine "newspaper" in legislation—to replace the default definition with another—flows from the power to amend that legislation, the County Commissioners *may* generally alter the definition of "newspaper" for purposes of local ordinances that the County Commissioners themselves have passed, assuming that the ordinance is otherwise within the County Commissioners' delegated authority. *See* Patterson Letter, *supra*, at 1; *see also* Letter from Kathryn M. Rowe, Assistant Attorney General, to Del. Michael D. Smigiel, Sr., at 3 (July 21, 2011) ("Smigiel Letter") (concluding that GP § 1-113 governs publication requirements in local ordinances "unless the local jurisdiction has adopted a separate definition"). The St. Mary's County Commissioners undoubtedly have power to amend their own ordinances. *See Dal Maso v. Board of County Comm'rs of Prince George's County*, 182 Md. 200, 206-07 (1943). And as we have explained, a particular law may adopt a specific definition that varies from the definition provided by a more generally applicable definitional statute. *See McDonald*, 141 Md. App. at 378-79; *cf. Bostetter*, 20 Md. App. at 241-42; 105 *Opinions of the Attorney General* at 28.

---

[8] *But see Police Patrol Sec. Sys., Inc. v. Prince George's County*, 378 Md. 702, 714-15 (2003) (holding that a local ordinance did not qualify as "law" under the Public Information Act given the structure of that specific statute).

One might argue that GP § 1-113 sets *universal* standards for legal notice in Maryland, meaning a local government could not adopt a different definition even in local legislation it had enacted on its own initiative or otherwise had the power to amend. Whether GP § 1-113 should be understood this way is a question of legislative intent. *Cf. Allied Vending, Inc. v. City of Bowie*, 332 Md. 279, 300-01 (1993) (whether State has preempted local legislation in a particular field turns on legislative intent).

In analyzing the intent of GP § 1-113, the first and most important consideration is its text: the General Assembly put the statute in the form of a definition. On its face, GP § 1-113 only defines the specific terms "newspaper" and "newspaper in general circulation," and only when one of those terms appears "in a law . . . that refers to publishing a legal advertisement or legal notice." The statute's form thus suggests that the General Assembly's primary intent was simply to provide a default definition of "newspaper" and "newspaper in general circulation," terms that had fostered uncertainty both in Maryland and elsewhere. *See, e.g.*, 7 *Opinions of the Attorney General* 183, 183-84 (1922) (concluding that a newspaper that had only recently resumed publication after a suspension could still qualify as a "newspaper"); 24 A.L.R.4th 822 (collecting cases in other states).

Reading GP § 1-113 as a universal rule for legal notice would also conflict with our prior advice. In 2001, as the Legislature was considering amending GP § 1-113 to provide a different definition for Prince George's County, our Office advised that GP § 1-113 permits a charter home rule county to set its own definition of "newspaper" for purposes of local laws, but not public general laws. Patterson Letter, *supra*, at 1. That advice relied on GP § 1-113's use of the phrase "[u]nless otherwise provided," and on charter home rule counties' implied authority to make procedural rules governing the exercise of their powers. *Id.*[9] To acknowledge that distinction, the bill was amended to insert the phrase "for

---

[9] The Express Powers Act, which delegates powers to home rule counties, also contains a provision similar to LG § 9-107, although the letter did not reference it. *See* LG § 10-308 ("A county may provide for advertising, printing, and publishing of county documents[.]"). In addition, the Constitution imposes a newspaper-publication requirement for proposed and amended "laws and ordinances" in charter home rule jurisdictions other than Baltimore City. Md. Const., Art. XI-A, § 3. For present purposes, however, we need not interpret LG § 10-308 nor decide how GP § 1-113 interacts with the constitutional mandate in Article XI-A, § 3.

purposes of the public general laws of the State" into the new, Prince George's County-specific provision. Amend. No. 182610/1, H.B. 1189, 2001 Leg., Reg. Sess. A note accompanying the amendment, as originally introduced, in the bill file explained that "[n]either the amendment nor the bill affects the existing authority of the County Council to determine what newspapers are used for notice required under county ordinances." Amend. No. 723122/1, H.B. 1189, 2001 Leg., Reg. Sess. Then, in 2011, our Office advised again—in response to a question regarding Cecil County, a commissioner county at the time—that GP § 1-113 governs local publication requirements "unless the local jurisdiction has adopted a separate definition." Smigiel Letter, *supra*, at 3. Thus, our consistent position has been that, for at least some local laws, local governments can set their own definition of "newspaper," GP § 1-113 notwithstanding.

We recognize that there is some contrary evidence that could reflect a legislative intent to establish across-the-board standards for legal notice. The statute's original title was "an Act . . . defining the publications in which legal notices and legal advertising shall be inserted," 1941 Md. Laws, ch. 905, rather than a title clearly treating the statute as definitional, such as "an Act defining the terms 'newspaper' and 'newspaper in general circulation.'" The General Assembly also inserted the provision into what was then Article 76 of the Code ("Publication of Laws"), rather than Article 1 ("Rules of Interpretation"). What is more, the statute as originally enacted did not contain the qualifying phrase "unless otherwise provided"—an omission that might indicate that the General Assembly intended the statute to apply across the board. *Id.* And more recently, the Revisor's Notes for the General Provisions Article described the GP § 1-113 definition as "more substantive than definitional in nature." 2014 Md. Laws, ch. 94, § 2.

But none of these indications is strong enough to overcome the clarity of the statute's text, which has been framed as a definition since 1941. Although a statute's title can be evidence of its meaning, we generally do not invoke the title to create ambiguity in otherwise clear text. *See Tidewater/Havre de Grace, Inc. v. Mayor & City Council of Havre de Grace*, 337 Md. 338, 347 n.7 (1995). The statute's initial placement in Article 76 also has limited significance, because definitional provisions can appear anywhere in the Code; in fact, by later moving the provision to Article 1 in code revision, the General Assembly confirmed that it was intended as definitional in spite of its original placement. 1984 Md. Laws, ch. 284, § 9 (enacting Art. 1, § 28). The insertion of "unless otherwise provided" in code revision is of similarly limited

significance.  As we have explained, because this phrase was added during non-substantive code revision, 1984 Md. Laws, ch. 284, § 9 (Revisor's Note to Art. 1, § 28); *Blanton*, 390 Md. at 538-39 (code-revision changes are ordinarily non-substantive), it is best understood as making explicit what is already implicit in a definitional statute:  the definition it provides can be overridden by contrary legislative intent in a particular provision that uses the defined term, *see McDonald*, 141 Md. App. at 378-79.  Finally, the more recent Revisor's Note characterizing the provision as "more substantive than definitional" during codification of the General Provisions Article could merely have been recognizing that the GP § 1-113 definition may be narrower than the ordinary meaning of "newspaper."  *Cf.* 7 *Opinions of the Attorney General* at 183-84 (prior to the enactment of what is now GP § 1-113, approving publication in a "newspaper" that would not appear to qualify under the current statute because it had not published and distributed any recent issues).  In our view, the best understanding of the General Assembly's intent in enacting what is now GP § 1-113 is that the Legislature wanted to set a default definition of a commonly used term, not to limit local governments' authority to define terms in the local laws they enact themselves.

A local government's power to redefine "newspaper" in local ordinances does have at least one important limitation, however.  In some cases, a local ordinance will adopt a newspaper notice requirement because State law mandates that one be included.  For example, before a public hearing on any amendment to the St. Mary's County Zoning Ordinance, the County must give notice in a newspaper in general circulation.  St. Mary's County Zoning Ord. 21.3.1.  This provision implements a mandate of public general law, which requires public hearings and newspaper notice on amendments to zoning regulations, as a condition on the delegation of zoning power to counties, *see* LU § 4-203, and which (as is important here) uses the defined phrase "newspaper of general circulation," *id.* § 4-203(b)(2)(i).  When county commissioners exercise a delegated power such as zoning, they must comply with all procedural limitations that State law imposes on that power. *See, e.g.*, *Montgomery County v. Revere Nat'l Corp.*, 341 Md. 366, 391-92 (1996); *Walker v. Board of County Comm'rs of Talbot County*, 208 Md. 72, 86 (1955); *Crozier v. County Comm'rs of Prince George's County*, 202 Md. 501, 506 (1953); *see also* 2A McQuillin, Municipal Corporations § 10:10 (3d ed.) ("[A] municipal corporation can exercise the powers expressly conferred on it only in the manner prescribed by the statute.").  So when a commissioner county adopts an ordinance with a newspaper-

publication requirement in order to comply with a State statute mandating "newspaper" publication, the local ordinance must comply with the definition of "newspaper" in GP § 1-113.[10]

In sum, although local ordinances that use the word "newspaper" incorporate the GP § 1-113 definition by default, the County Commissioners may substitute a different definition for purposes of any local ordinance's newspaper publication requirement, unless the requirement was adopted to comply with a State law that itself mandates publication of notice in a "newspaper" or "newspaper in general circulation."

### B. *Redefining "Newspaper" Without a Public Hearing*

Having concluded that the St. Mary's County Commissioners may adopt their own definition of "newspaper" in some limited circumstances, we turn to your second question, which asks whether the County Commissioners may do so without holding a public hearing under § 9-105 of the Local Government Article.

Under LG § 9-105, the county commissioners of a commissioner county "may not adopt an act, an ordinance, or a resolution until 10 days after a public hearing has been held on the proposed act, ordinance, or resolution." LG § 9-105(c)(1). The public hearing must be advertised for two weeks in advance of the hearing, in a newspaper in general circulation. *Id.* § 9-105(c)(2). These requirements apply only to the exercise of a statutory power "that specifically references" section 9-105. *Id.* § 9-105(b)(1); *see also* Md. Op. Att'y Gen. No. 78-101 (1978) (unpublished). And, as relevant here, the requirement specifically exempts "an administrative act of the county commissioners of . . . St. Mary's County." LG § 9-105(b)(2).[11]

---

[10] Even in such cases, though, a county might be able to adopt an *additional* publication requirement that goes beyond the State-law requirement—again assuming the county otherwise has power to legislate on the subject. That is, although there is no need to decide this question here, when State law requires a county to publish notice of a certain action in one "newspaper," a county might also require itself to publish in a second newspaper, which would not necessarily have to comply with GP § 1-113. *See* Letter from Richard E. Israel, Assistant Attorney General, to Sen. Frederick C. Malkus, Jr., at 2 (Oct. 13, 1992) ("Malkus Letter"); *Reed v. President & Comm'rs of Town of North East*, 226 Md. 229, 249 (1961).

[11] We understand that the County would adopt any redefinition of "newspaper" or "newspaper in general circulation" at an *open* meeting. *See*

As a threshold matter, we must consider whether redefining "newspaper" for purposes of locally imposed notice requirements implicates a delegated power that "specifically references" LG § 9-105. In our opinion, the answer is yes: a county's adoption of a newspaper-publication requirement that goes beyond the requirements of State law implicates the power delegated by LG § 9-107(c) to "provide for advertising, printing, and publishing."

To be sure, LG § 9-107(c)'s text is limited to publication of "laws, ordinances, resolutions, or regulations adopted by the county" as well as the county's annual financial statements. LG § 9-107(c). It does not expressly cover notice of other matters, such as upcoming public hearings. But the statute's purpose and history suggest that it was intended to confer power to provide for advertising and publishing more generally.

In its original text (which has since been modified only in non-substantive code revision, 2013 Md. Laws, ch. 119), Chapter 730 granted commissioner counties the power "[t]o provide for county advertising, printing and publishing of all laws, ordinances, resolutions or regulations, adopted by the County Commissioners and the annual statements of receipts and expenditures of the County." 1947 Md. Laws, ch. 730, § 1 (enacting Art. 25, § 2A(j)). This original language, in our view, is best read as allowing counties to "provide for" three separate categories of publication: (1) "county advertising," (2) "printing and publishing of all laws, ordinances, resolutions or regulations, adopted by the County Commissioners," and (3) "the annual statements of receipts and expenditures of the County." *Id.*[12] We do not think the more

_____

LG §§ 9-101, 9-512(d). Your question is instead whether that meeting would also need to be a "public hearing." Under the County Commissioners' usual practice, a "public hearing" is apparently distinguished from an open meeting in that members of the public are given the opportunity to speak at a public hearing. But you have not asked us to define "public hearing," and we need not do so for purposes of this opinion.

[12] A parallel provision for municipalities, enacted two days later, supports this reading by more clearly recognizing the three separate categories. That parallel provision authorizes municipalities "[t]o provide for municipal advertising, for the printing and publication of statements of the receipts and expenditures of the municipality, and the publication and codification of all laws, ordinances, resolutions, or regulations adopted by or affecting the municipality." 1947 Md. Laws, ch. 731, § 1 (enacting Art. 23A, § 2(1)). Additionally, the legislative

recent, non-substantive code revision was intended to change that meaning.  *See Blanton*, 390 Md. at 538-39.

The statute's purpose also suggests that it is not limited to publication of laws and ordinances.  Rather, the General Assembly apparently intended to give counties a degree of autonomy with respect to printing and advertising generally, *see* Md. Legislative Council, *Local Government: A Comparative Study* 38-39 (1944), replacing the earlier regime under which the Legislature had tightly controlled counties' spending on printing and publishing of all kinds, not just of laws and ordinances, *see, e.g.*, 1878 Md. Laws, ch. 290 (St. Mary's County); Prince George's County Code of Public Local Laws § 322 (1930); Cecil County Code of Public Local Laws § 138 (1930).  We thus read § 9-107(c), in light of its history and purpose, as granting commissioner counties general authority to provide for printing, publishing, and advertising, provided that they remain within the bounds set by other State statutes.  *See* Part II.A.1; *see* Malkus Letter, *supra*, at 2 (advising that LG § 9-107's predecessor statute authorizes counties to "give notice . . . of meetings, procurement, and other activities for which State law does not specifically prescribe the notice to be given").

We recognize that county commissioners may well have had some implied authority to adopt new notice requirements for the exercise of their own delegated powers even before LG § 9-107.  *See Scull*, 249 Md. at 281-82 (recognizing that even before adopting home rule, a county could pass regulations and ordinances to "implement and facilitate and insure the proper execution" of the General Assembly's public local laws); *cf.* Patterson Letter, *supra*, at 1-2 (recognizing charter home rule counties' implied authority to adopt notice rules).  But nothing prevents the General Assembly from codifying a formerly implicit power of commissioner counties and, in doing so, qualifying that power with a new procedural limitation, such as a public-hearing requirement.  *See* 76 *Opinions of the Attorney General* at 137; *Prince George's County Comm'rs v. Mitchell*, 97 Md. 330, 337 (1903) (recognizing

---

history indicates that the General Assembly intended to grant commissioner counties a power "substantially like" the power conferred on charter counties by the original Express Powers Act:  "[t]o provide for county advertising, printing and publishing, *including* that of all ordinances, by-laws or resolutions adopted by the County Council and of annual statements of expenses of the County Government."  1918 Md. Laws, ch. 456 (enacting Art. 25A, § 3(D)) (emphasis added); *see* Md. Legislative Council, *Local Government: A Comparative Study* 38 (1944).

that General Assembly may alter or diminish commissioner county powers). Because an ordinance or resolution adopted under LG § 9-107 is expressly subject to the procedural provisions of LG § 9-105, *see* LG § 9-107(b), the public-hearing requirement would apply to such an enactment unless the redefinition of "newspaper" qualifies as an "administrative act."[13]

In determining the meaning of "administrative act" as applied here, the history of the exemption in LG § 9-105 for "administrative act[s]" is instructive. LG § 9-105's predecessor originally applied to every "act, ordinance or resolution" exercising one of the Chapter 730 powers, without exception. 1947 Md. Laws, ch. 730 (enacting Art. 25, § 2A(r)). In 1965, the General Assembly added an exception for an "administrative act or resolution adopted by the County Commissioners of Harford County." 1965 Md. Laws, ch. 211. The Legislature went on to extend the "administrative act" exception to several counties, including St. Mary's County in 1974. 1974 Md. Laws, ch. 499.

At the time the General Assembly first enacted the "administrative act" exception in 1965, the Court of Appeals had recently established a test for distinguishing between "legislative" functions and so-called "administrative" or "executive" functions of county governments, *Hormes v. Baltimore County*, 225 Md. 371, 377-78 (1961)—a distinction that is especially important in commissioner counties because the commissioners in such counties exercise both legislative and executive functions, *see Forty West*, 178 Md. App. at 338-39. The Court explained that "[t]he crucial test for determining what is legislative and what is administrative has been said to be whether the ordinance is one making a new law or one executing a law in existence." *Hormes*, 225 Md. at 377-78 (quoting 2 McQuillin, Municipal Corporations § 10:06 (3d ed.)). Cases shortly after 1965 reaffirmed that test and the distinction between legislative and administrative acts for both home rule and

---

[13] This opinion addresses only whether the adoption or amendment of a local newspaper-publication requirement is authorized by LG § 9-107 and thus is subject to the procedural mandate of LG § 9-105. We do not consider what procedural requirements may apply to other acts of publication. For example, if a commissioner county were to enact an ordinance, in compliance with LG § 9-105, authorizing publication of documents under certain specified conditions, then individual publications under the terms of the ordinance would presumably not implicate LG § 9-105 and thus presumably would not require a separate hearing.

non–home rule counties, *see Scull*, 249 Md. at 282 (explaining that a measure will ordinarily qualify as legislative if it is "an enactment of general application prescribing a new plan or policy"); *City of Bowie v. County Comm'rs for Prince George's County*, 258 Md. 454, 463-64 (1970) (same), as have more recent court decisions and opinions from our Office, *see Queen Anne's Conservation, Inc. v. County Comm'rs of Queen Anne's County*, 382 Md. 306, 326-27 (2004); 66 *Opinions of the Attorney General* 253, 257-58 (1981); Md. Op. Att'y Gen. No. 77-001 (1977) (unpublished).[14]  So while we need not define "administrative act" for all purposes, we can conclude that acts that are legislative in nature do not qualify, in light of the general legal background in 1965 that recognized the "legislative" and "administrative" categories as distinct and mutually exclusive.

Based on that understanding of the statute, it is clear that adopting a new definition of "newspaper" that differs from GP § 1-113 would not be an "administrative act."  Because a statutory definition is a part of a law that uses the defined term, and an existing definition cannot be changed without amending the law in question, *see* Part II.A.1, *supra*, a change to the definition of "newspaper" in local ordinances would necessarily be a legislative act, not an administrative one.  Such an act would alter existing law (that is, it would amend earlier legislative acts), rather than merely implement existing law.  *See* 6 McQuillin, Municipal Corporations § 21:1 (3d ed.) ("Amendment to an ordinance is a legislative act and when amending a council is acting in a legislative capacity."); *see also Town of New Market v. Milrey, Inc.-FDI P'ship*, 90 Md. App. 528, 541 (1992) (amendment to annexation resolution is subject to the same procedural requirements as original resolution); *accord Margolis v. District Court*, 638 P.2d 297, 303-04 (Colo. 1981); *Arnel Dev. Co. v. City of Costa Mesa*, 620 P.2d 565, 569 (Cal. 1980).  The adoption of a new definition of "newspaper" in a particular ordinance would also be legislative in that it would be

---

[14] Consistent with that well-understood distinction between legislative and administrative acts, when the General Assembly enacted the law that extended the "administrative act" exception to St. Mary's County, the Legislature also added a provision to the St. Mary's County Code which established the same procedural requirements as LG § 9-105 but affirmatively applied them only to "ordinance[s]," defined as "permanent rule[s] of law enacted by the County Commissioners."  1974 Md. Laws, ch. 499.  This parallel provision was later repealed, possibly as superfluous.  *See* 1980 Md. Laws, ch. 235.  Read together, these two provisions of Chapter 499 contemplated that in St. Mary's County the public-hearing requirement would at a minimum apply to ordinances, defined as measures establishing permanent rules of law.

"an enactment of general application prescribing a new plan or policy" for notice under the affected ordinance. *See, e.g.*, *Queen Anne's Conservation, Inc.*, 382 Md. at 326 (quoting *City of Bowie*, 258 Md. at 463). The adoption of a new definition of "newspaper" thus would not qualify for the exemption from the public hearing requirement in LG § 9-105 for "administrative" acts.

### III
### Conclusion

In our opinion, the St. Mary's County Commissioners may adopt a definition of "newspaper" and "newspaper in general circulation" that differs from the definition in GP § 1-113, but only for purposes of local ordinances rather than public general laws or public local laws enacted by the General Assembly and, even then, only when the local ordinance in question is based on State enabling legislation that does not itself require publication of notice in a "newspaper" or "newspaper in general circulation." It is also our opinion that, if the St. Mary's County Commissioners seek to amend the definition of "newspaper" or "newspaper in general circulation" for purposes of local ordinances, the amendment would not be an "administrative act," and would be subject to the procedural requirements of LG § 9-105, including the requirement of a public hearing.

Brian E. Frosh
Attorney General of Maryland

Thomas S. Chapman
Assistant Attorney General

Patrick B. Hughes
Chief Counsel, Opinions & Advice